Because I have a motion to make, I'm going to have to turn the gavel over to Judge Wallace for the first part of the morning. Please proceed. I have the privilege of moving the admission of Glenn Chang. He's a member of the Bar and is in good standing with the highest courts in both New York and New Jersey. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. In fact, I have intimate knowledge of his credentials because he has been my law clerk for the last year. He has almost too many degrees, but that was a benefit to me. He is a graduate of the College of New Jersey Honors College where he had a BS in biology. He has an MD from Rutgers New Jersey Medical School and a law degree from Rutgers School of Law. He did all of those with great distinction, and he has served me with great distinction after having been both a practicing doctor and a practicing lawyer. So I've had the privilege of getting to know him and getting to know his beautiful family. His wife, Jew, and daughter, Gloria, are here with us today, too. I'm sure Gloria will never forget this moment, but at least I hope Glenn will never forget this moment. So with all of those credentials, I move his admission. I have a few questions. Doc, I've got this crick in my neck. Judge Strato? I concur. Your motion is granted. But I should say that despite the fact that he's now being sworn in to the bar, that he actually had his first appearance before the court yesterday because we had a pro se applicant who could not speak English, and luckily Glenn could translate the Mandarin Chinese for us. So both Judge Clevender and Judge Newman were very impressed with Glenn's appearance in the well yesterday. So welcome. Thank you. Please raise your right hand. Do you solemnly swear or affirm that you will report yourself as an attorney and counsel of this court outrightly and according to law, and that you will support the Constitution of the United States of America? I do. Welcome to the bar of the United States Voter Appeal of the Federal Circuit. Thank you. You're welcome. Okay. With that happy event over, we now move to the argued cases for today. We have four argued cases on the calendar and two submitted cases. The first of the argued cases is docket number 151719, NetApp Inc. v. Electronics and Telecom. It is an appeal from the Patent Trial and Appeal Board. Mr. Kang, you want five minutes for rebuttal? Yes, ma'am. All right. You may begin. May it please the court. My name is Peter Kang, and I represent NetApp in this case. Your Honors, there are three independent reasons why the board's decision in this case should be reversed. First, the board committed legal error in construing the claim term raid to require a system which forbids direct access between the host computers on one end and the disks of the raid on the other end, where that limitation does nowhere appear and has no support in the intrinsic evidence. And the only citation to the board in support of that limitation was attorney argument. Can I just ask, the way that I read this was that the claim construction didn't use language about direct access, and we'll get back to that, it used language about single logical unit. Yes, Your Honor. Then on the application side, not the claim construction side, and I'm pretty sure this is the way it was presented by Dr. Conte in his declaration, the direct access comes up as an application issue in the familiar construction application divide to which the substantial evidence standard would apply. So I'm not quite sure you're right in saying that the direct access was a piece of the claim construction. As this court ruled in the Respironics opinion, which just issued last week, an application of a claim construction which adds a further limitation to the construction, in other words, a construction of the construction, is itself a claim construction. And that's exactly what happened here. Well, why is that what happened? I mean, the claim construction was done, as I understand it, on the theory that the intrinsic evidence doesn't tell us a whole lot. So you have to look to what people in the extra patent world would understand the term to mean. We think the board said it means a single logical unit. And then in applying it said you don't have a single logical unit, the way an expert would testify at a trial at the application stage after claim construction is done, to say as long as the host is able to get separate disk access, and I use here separate as a word like direct, then it's not a single logical file. There's nothing in the phrase single logical unit which implies or talks about that direct or separate access. That's what experts do in testifying about the application of a term that has been construed. They say, you know, I believe that these words read on the following and don't read on the following. And first, if I may point out, Dr. Conte's declaration of the testimony nowhere actually addresses this point. The cited testimony from Dr. Conte simply talks about the raid being a black box. There is no support in this record for any expert testimony that goes along the syllogism that Your Honor posited, that I am applying the single logical unit construction to understand it to mean that there cannot be this direct access. That's nowhere in the testimonial record. That's why the board simply cited to attorney argument in support of this construction. But it was, again, I mean, I have to agree with Judge Taranto that there's a distinction between a construction and the application of that construction to your anticipation analysis, to an anticipation analysis. And isn't there other evidence in the record that the board could cite to conclude that given the single logical unit construction and what that must mean that this doesn't anticipate because of the indirect versus direct analysis? So, no, Your Honor. To that point, there is no evidence in the record that Hathorne actually forbids this kind of direct access. On page 53 of Patent Donor's Brief, they have a figure replicated from Hathorne, which shows all the connections from the host computer to the disks always go through indirectly through the controllers in the middle. And so Hathorne does forbid exactly the kind of direct access that the board said has to be forbidden in the system. And so the board's decision on that issue doesn't stand up to substantial evidence. But the rest of the lines— I'm sorry. What do you mean by Hathorne forbids the direct access? So the— Is this because there's a disk-specific controller sitting between the host and what? And the disk drive? Yes, Your Honor. So why is it that IBM calls that direct access? The problem we have is we don't know what the board meant by lack of or forbidding direct access because— It means what it meant is separate access, that the host gets separate access to each disk drive, and there may be a door in front of it, call it a disk-specific controller, but it's the one that gets to decide, that is entitled to decide, that the host wants to send something to a disk. And that's one of the problems with this application of this construction in that the patent itself, the 346 patent, has that structure, has exactly that. The patent itself requires, in the claim, direct access between the hosts and the controllers. And so what the board has done is come up with an inconsistent, logically fallacious application of its construction where the claim and the patent itself is that structure. So wait, wait, wait, wait. So are you arguing that Hathorne requires direct access, or are you arguing that the board misinterpreted the patent that was challenged? As I understand, Your Honor, the board's logic, the claim forbids direct access between the hosts and the disks, and the board found that Hathorne does not forbid that direct access. If direct access means it can go via or through the controllers to get to the disks, then there is no individual access in Hathorne in any event because Hathorne discloses that the disks shown in the figure is representative of a whole string of disks. And so there's no way to get at any one individual disk from the host. The host has no way to address which separate or individual disk it may want to, even if it tried. It's up to the controller in the middle to make that determination. I thought that, I guess what I'm remembering, and just correct me if I'm wrong, you rely heavily on column seven of Hathorne describing figure two, which figure three is just a variant of. So in this respect, it's the same. And you rely on lines that say the host can get to a particular disk in two ways. Either it can direct its information to that disk, that particular disk, again by way of the disk-specific controller, or it can direct its information to its primary controller, and the primary controller can do the selection. And I took it your position on Hathorne was that as long as that first option was available, then it is teaching a RAID whose point, even under the claim construction adopted by the board, is that the host isn't doing the selecting of the disk. And it was the option of the primary host controller choosing disks that you were relying on. Did I misunderstand? The control there is not the disk controller. There's a network controller in Hathorne in the middle there that is actually performing the option. That's why the host computers cannot direct themselves which disk to get to in Hathorne. They have to go through the network controllers in the middle. And that's why there's no individual access to disks on the disk side of Hathorne. And that's why the board's decision here doesn't stand up to substantial evidence. Furthermore, going to the point, the intrinsic record here for the 346 patent is completely ignored by the board. The board should not have resorted to extrinsic evidence. The board didn't ignore the intrinsic evidence. You say that repeatedly the acronym is explained or defined, but it happens twice, one of which was in the abstract which we know doesn't mean very much. So twice they tell you what the words of the acronym are in a colloquial form, but that doesn't mean that that explains what that word means for purposes of this patented invention. And beyond expanding the acronym, the 346 specification at column 1 lines 18 says, a RAID is a storage system based on a large capacity and a high performance. I guess my problem with that is that that expression is sometimes definitional and is sometimes not. If I said a rectangle is a four-sided polygon, I would not be defining a rectangle. I would be describing a feature of it. So why is this something other than that? There is nothing in the 346 specification which talks about single logical unit. There is nothing in this definitional language or this descriptive language. The point is this, that the only thing of informational value in the intrinsic evidence, and here I mean in intrinsic evidence, is basically that sentence and there's a version of it in the abstract. But the board, it seemed to me, was perfectly entitled to say, we don't know whether that's definitional or not. In order to tell whether it's definitional, I'm asking myself the same question as if it said a rectangle is a four-sided polygon, and I need to go and find out whether in the extra patent world, people use the thing in front of the is, rectangle, to mean something more. It's one of the kinds of four-sided polygons, but it's not all of them. Your Honor, in this case, as in Vitronics, if the intrinsic evidence is not ambiguous, resort to ambiguous extrinsic evidence is improper. No, it's not. Phillips made it clear that it's not. I mean, I don't know why we're still going back to Vitronics. It's not improper. The intrinsic evidence might be more persuasive at times, but it's never improper to look at it. I overspoke, Your Honor. The extrinsic evidence in this case on this record is certainly ambiguous. There is extrinsic evidence that predates the priority date of this patent, which has no such single logical unit limitation. The Wygant reference expressly relied on by the Board says RAIDs can be configured in many ways and only uses the single unit language as an alternative and does not require it. As Phillips said, we are supposed to interpret words in light of the entirety of the specification and in light of what it is that that specification discloses. The Board said it's not very clear what the specification discloses, but it does disclose one thing. It says the RAID, and so they had to find out what the RAID meant for purposes of this patent. As I said, at column one it goes on to say a RAID is a fault-tolerant system in which the disks or controllers have a redundant nature. There is specific disclosure in the specification as to what a RAID is for purposes of this patent, which is absolutely consistent with the extrinsic evidence. All the extrinsic evidence does, in fact, comport with this definition, redundant nature of fault tolerance. The extrinsic evidence is not wholly consistent with the additional limitation of single logical unit. In fact, the phrase single logical unit does not appear in any of the extrinsic evidence. Just assume with me that I think that variants are everywhere with the possible exception of WGANT, and there was certainly evidence from Dr. Conte, and the Board, I think, was signaling some uncertainty about what the heck to make of WGANT. Dr. Conte said it was nonsensical. It's not entirely clear what the language of WGANT meant, whether it was limited to some arrangement that uses both striping and mirroring. And the Board's language, I think at one point it said WGANT indicates this, and then the second time on page 9 of the opinion it said that the term might extend to certain non-single logical units. And ultimately, why couldn't the Board say, we're just not really sure what to make of WGANT, it's the odd man out here, and a skilled artisan would really quite generally understand that when you refer to a RAID, you're referring to something that is acting as a single logical unit, in the particular sense that allocations inside it are something that the host is blind to. So first, Your Honor, the WGANT is not, under Chenoweth, we have to look at what the Board actually did here, and their construction of single logical unit relies expressly on WGANT and does not squarely address why the alternatives, it doesn't say in fact that they're not sure why it's talking about alternatives, they mention it, but it's counsel's argument that there's some uncertainty there. The actual construction that it adopted says single logical unit without exception, doesn't it? Yes, Your Honor. And I think that's what the other side defends. It's only in, I think, two sentences that don't get incorporated into the formal claim construction that says, well, we're not so sure about whether you need to have a single logical unit if you have a combination of striping and mirroring. But WGANT says that, first of all, WGANT says that mirroring is RAID Level 1. Chen says mirroring is RAID Level 1, and Hathorne, their own expert, sorry, patent owner's expert, admits Hathorne discloses RAID Level 1. I don't, I'm not sure it says that all mirroring is RAID Level 1. And in fact, we would submit, Your Honor, that that's the Where does he admit that? Sorry, Your Honor. I'm looking at your discussion from 57, 58 of the red grade. He admits it at JA 2100 starting at line 25 and ending at 2101 at line 2. Did you raise that argument before? Yes, we did, Your Honor. Did you submit the figure in page 58 to the board? Yes, Your Honor. Where is that in the record? You can find it, Your Honor. It was in the reply brief, I believe. Is that correct? Yes. Our reply before the board pointed to Dr. Conte's admission with reference to the mirroring operation at JA 337, and we presented the figure below, which is identical to that in our brief. And if you compare our brief at page 55 with JA 1770, and then also look at the testimony at, I'm sorry, the citation at JA 389 starting at line 5 and JA 426 starting at line 8.  I think you're out of time. I'll give you three minutes for a rebuttal. Thank you, Your Honor. Start by discussing your statement in the red brief at 56 that the illustration at 58 was not presented to the board. Excuse me, Your Honor. You are referring to the statement in page 56 of the red brief, Your Honor? Yes. That begins the drawing on page 58. I do not believe that the drawing on page 58, the annotated figure of figure 3 of Hathorne was presented below to the board. Well, it's not a question of do not believe. You made a statement in your red brief. Yes. That's a certification to the court. Yes. I do not recall that this was presented to the board below. If it was. I couldn't find it. I couldn't find it. If I overlooked it, I apologize. If it was below, it was such a minor point that it escaped me. All right. Let's go to the construction issue. The RAID, it is true that twice, in parens, it defines it. Does it not in the spec? No. Twice in the specification, the patent expands the acronym. It says that a RAID is an acronym for redundant array of independent diffs. That is not presented as a definition of the term RAID, and that expansion of the acronym by itself does not convey the full meaning of the term to one of ordinary skill in the art. That's what the board recognized, and that's why the board turned to the extrinsic evidence. There are lots of times, though, when acronyms just calling out the acronyms, like RAM or DRAM. I mean, they tell you what they are, right? Sometimes they do. It's case by case, Your Honor. Some acronyms, when expanded, may fully and completely indicate the meaning of that acronym to those skilled in the art, and sometimes they do not. In this case, the acronym RAID does not. In fact, it's even misleading. The word redundant from the letter R is actually optional because RAID level zero is a non-redundant form of RAID. The word inexpensive is actually not correct because those of skill in the art understand that the array or the diffs may be independent or inexpensive. In fact, the D for diffs is imprecise. It actually means diff drives to those skilled in the art, not diffs. That's true for many acronyms. They're catchy. They're shorthand. They can be pronounced. That's why they were chosen, not because they present a precise definition of the term as understood by one skilled in the art. Can you address what you think the board said about WIGANT and whether to be a RAID there needs to be a single logical unit, full stop, without exception? Basically, on pages eight and nine, it seemed to me that the board was saying WIGANT, I think the one term was indicates that maybe that's not always true, but that the board didn't come to a firm conclusion about that and the actual claim construction it adopts at the end of that little section of its opinion doesn't have any limitation in it. I'm trying to figure out what to make of what the board did, bowing toward WIGANT and then applying a, there must be a single logical unit. Yes, so the board did correctly recognize that WIGANT does say that perhaps some aspect, in some sense, there may be a RAID that is not a single logical unit. But the board credited the testimony of Dr. Conte, the expert in this case, who said, I can't make sense of what that means. The board didn't cite that, did it? I don't think it did. Perhaps they didn't cite that in their opinion, but they were well aware of it. That was testimony that was presented by Dr. Conte. But didn't Dr. Conte say that if you're going to have mirroring or striping, you have to have two? You have to have two disk drives to do mirroring or striping. You must have multiple disk drives, yes. All right, so how does that encompass a RAID if a RAID has to be a single logical unit? So the multiple disk drives that are the constituents of a RAID are presented to the host as a single logical unit. Dr. Conte explained that that is what a RAID does. It presents a single interface to the host. It's like a black box. So the host computers look at this black box as if it were just another storage device. And, in fact, the host computers don't know that the storage device is a RAID or a simple disk drive. That is the nature of a black box, and that is the nature of a RAID, that it presents itself as a single logical unit. And that is why the board was correct to conclude that a RAID is a firm requirement for a RAID to be a single logical unit, and that is their construction. And even if there were some evidence to the contrary in the record below, your honors can and should affirm under the substantial evidence standard, because these are factual findings we're talking about. So what do you make of column seven of Hathorne, which says that if the host, the primary host up on the top portion of the diagram, wants to put stuff in a number of the different disk drives, or the DASDs, I guess as they're called, there are kind of two ways that can happen. The host can direct that to happen through the storage controller, or can give it to the storage controller in the north portion of the diagram, and the storage controller can do the allocating. Why isn't the first way of doing it something that amounts to a RAID? If that were the only way to do it, then perhaps there would be a RAID. But the mere existence of the capability to directly access that second disk drive, a constituent disk drive of the alleged RAID, means that the pair of disk drives is not a single logical unit. They are separate logical units. And that is why each one is independently or individually accessible. Can we connect that thought in a way I might be able to understand to the statement that Dr. Conte made, I think this is 1745 and 1746, that says a RAID is something that you can just, and you referred to this a moment ago, swap out for a single large expensive disk, is that the SLED, without changing the interface. Why would, if you started in a system with a single large disk  and you then created the Hawthorne system, why would the interface have to change? The Hawthorne system, column seven, which allows two options to get the data to or from a particular disk under the control of the host or under the control of the storage controller directly connected to that. Right. Why would there have to be a different interface? There is a different interface in Hawthorne. There's the direct access to the remote DASD, or there's the access that happens by the remote mirror copy operation. So there's two different ways to access the remote DASD in Hawthorne. And what Dr. Conte was saying on pages JA of 1745 and 46, is that with a RAID, the host computers accesses the RAID as a single logical unit through just one interface and cannot look behind the wrapper of the black box. What's the interface? I'm not adept at this to know what the connection is between the two different ways described in column seven and the term interface. And yet Dr. Conte uses the term interface. He says the idea of a RAID is that if you have a single disk, a sled, and you get rid of it and stick in a RAID, the interface doesn't have to change, the interface between the host and the memory system, call it. Right. The interface to a RAID is its RAID controller. And there may be multiple RAID controllers for the same RAID, each of which presents an interface that a host computer can go through, a door through which the host computer can go through to access the RAID. Dr. Conte's point is that the interface is the RAID controller and there are multiple RAID controllers. Then how is that a logical single unit? There are different RAID controllers for the same RAID. The key distinction between a RAID and separate logical disks is that when you have separate logical disks that are not a RAID, the host controllers can individually access those individual disk drives, DASDs, D-A-S-D in the IBM terminology and Hathorne. It can look behind the wrapper of the black box and access the constituent disk drives. Whereas in a RAID, the controllers simply access, or the host computers simply access the entirety, the single logical unit, whether it's from RAID controller A or RAID controller B for the same RAID. It doesn't matter. And Dr. Conte's point that you can substitute a RAID for a SLED means that electronically the host computer just writes to or reads from one of those RAID controllers exactly like it would write to or read from a controller for a single simple disk drive. Electronically the- And your position is that as in column 7 of Hathorne, as long as the host has the option of individually addressing a particular DASD, then it's not a RAID, even if it can also deal with the manager at the front desk of the storage unit. Yes, exactly, Your Honor. Can I get back for a minute to this thorny issue of the board and Weygandt? Sure. The board said, maybe Weygandt suggests this, but then it had some sentence that said in effect, striping and mirroring doesn't really seem to be part of this patent. Do you remember the phrase? So what I believe the board meant there is that the details of striping or mirroring are not- And that I took to kind of be- That was ultimately the board's reason for saying, well, whatever Weygandt says, it's not applicable here. Can you- And that seems like a point of- sort of an intrinsic evidence point, not an extrinsic evidence point. And so I want to understand to the extent, and I realize there's an argument that that's not really what's dispositive here, but to the extent that's what the board was saying. What is it about the 346 patent that would confirm, if you think it does, that striping and mirroring are pretty clearly from the intrinsic evidence, not something that this patent is about? Well, I believe what the board was saying is that what Weygandt, when it refers to a situation where there's not a single logical unit, has in mind some combination of striping and mirroring. The experts aren't sure what that combination is, but some combination of striping and mirroring that Weygandt thinks would still qualify as a RAID. Like RAID 1 slash 0. Exactly, I believe. And the board looked at the 346 patent and realized that the 346 patent talks about RAID at a high level, does not distinguish between particular levels of RAID, does not attempt to call out specifically that particular combination of RAID, RAID 1 slash 0. Well, it certainly doesn't exclude it. I mean, it's one of the shortest patents that I've ever read, so it doesn't exclude mirroring and striping, does it? It does not exclude mirroring. It does not exclude striping. But to the extent that there's a combination of striping and mirroring that the experts don't understand, that one reference says is a RAID, it would exclude that, because those skilled in the art would not consider that to actually be a RAID. So what you think the board really meant here was not that this patent doesn't disclose this, but that we don't understand what this is that Weygandt talked about? I believe so, yes. And to the extent this is relevant, it's not what the patent is specifically directed at. I have a question. I thought that their strategy of trying to give us a different opinion, a different board decision to analyze was an interesting one, because I know you'd rather be here on appeal from that decision because it was much more fulsome, but isn't the mere fact that that decision is more fulsome, doesn't that present a problem for you in this case? In other words, if we can look at that, we could say, oh, well, this is the way the board really should do its analysis, but it didn't necessarily do that here. No, I think the second decision by the board simply underscores the fact that it reached the right conclusion in this case below that's on appeal here. The exact same issue with the exact same evidence plus some additional evidence that clearly supports us. Right, more evidence, more analysis. I mean, I would think that that's kind of the opposite of what you had hoped we would take from that second decision, right? I hope not. I mean, I bet that if your honors were presented with a similar issue in a second appeal, you would have additional insights that would allow you to draft an opinion that's perhaps tighter and more complete, but that in no way would- You don't think we get it right the first time every time? I was going to say, you don't think we rule 36? You always get it right the first time, and that's just natural. I mean, that's the way things happen if you look at the same issues the second time. The important point is they reach the same conclusion on the same issue presented by two different challengers, and so the board is really confident in its conclusion. Okay. And it's the same board, right? Same panel of the same three judges, yes. Okay. Three minutes. Thank you, Your Honor. Counsel argued that the acronym for RAID is not a definition. However, Dr. Conte admitted at JA 2065 starting at line 15 that that expansion of the acronym is a definition, and he agrees with it. A definition of the acronym or a definition of the words that define the acronym? Well, at that point in the transcript, he agreed that the expansion of the acronym is a correct definition. He agreed with it. Later in the transcript, he agreed that the portion I read from the 346 patent, column 1, line 18, he agreed with that that's a correct definition of RAID. And so that's at JA 2063 starting at line 2. You're not contending that every time there's an acronym that the correct construction of it is to pull out all the words? I don't need to argue that every time there's an acronym that that's the correct construction. In this case, it is the correct construction, especially where it's supplemented by that further definitional or descriptive language at column 1. Are we supposed to assume that it's inexpensive or independent? Which word? The fuller description says it has to be fault tolerant and redundant in nature, and so I would argue that's a description of independent disks. Okay, but the word independent isn't really in the acronym, is it? As expanded in the specification itself, that's correct. To use an example Judge O'Malley used earlier, if I wanted to know what the definition of RAM is, do you think it would cover every memory system in which access was random? You wouldn't. No. And I'm not arguing that every time there's an acronym that that is always the correct construction. What I'm saying is even if you look at the extrinsic evidence here, the extrinsic evidence supports the construction which is consistent with column 1. The testimony upon which you are relying is at best ambiguous. I'm sorry, Your Honor? I said the testimony of Dr. Conte upon which you are relying is at best ambiguous, because of the ambiguity of the questions. Well, he expressly says he agrees with those definitions. He doesn't caveat that in any way. But he doesn't say, when he says he agrees with the definitions, he doesn't say anything more than that the letters R, A, I, D have an accepted meaning. And that's correct, Your Honor. But he does go on, as I said, later in the transcript at 2063, starting at line 2, to agree that the fuller passage at column 1, lines 18, which I read, he agrees with that definition. Really? I think it's at best ambiguous. I don't believe he caveated. I just reread those pages. The issue here is counsel argued that somebody of ordinary skill would not understand RAID to have the meaning as set forth in the specification. Dr. Conte himself certainly didn't deny that those were appropriate, and so that argument by counsel was not well supported in the record. Further, the only intrinsic evidence that the Board really looked at here is the phrase A-RAID. They relied on A to be construed as single. No, the. They also relied on the RAID. But the claim says A. The claim says A-RAID. It doesn't say it isn't limited to a single. And they elevated A-RAID to mean one and only one RAID, meaning a single logical unit. If I can go very briefly to column 7 of Wygant, Your Honor, and counsel's arguments there. Of Hathorne? Of Hathorne, I'm sorry. It's clear in Hathorne that passage in column 7 is forbidding direct access between the hosts and the backup disks. It says it has to go through the first controller to get to the second controller. And so there's nothing in the Board's decision that supports a finding that that disclosure somehow avoids the claim language even as construed. In other words.  Thank you, Your Honor.